Filed 6/28/24 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CBRE et al., | D083130 |
| Petitioners, | |
| v. | (Super. Ct. No. 37-2021-00033025-CU-PO-CTL) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | ORDER MODIFYING OPINION AND DENYING REHEARING |
| JAKE JOHNSON, | |
| Real Party in Interest. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the dissent to the opinion filed on June 4, 2024, be modified as follows:

The last sentence of the first full paragraph on page 2 (beginning with "CBRE acknowledged") is deleted and replaced with the following:

> Crew "always" told CBRE that "[t]he liability's on you" for the consequences of CBRE's decision not to obtain permits, meaning "if an inspector comes into the building and sees that we're doing work without a permit, it will have to be stopped, and [the owner will] have to pay" to get the necessary approvals. CBRE never disputed these assertions

by Crew, showing that CBRE and PRI understood the ramifications of the decision.

The second sentence of the first full paragraph on page 4 (beginning with "As noted above") is deleted and replaced with the following:

> As noted above, CBRE did not dispute that the owners would be responsible for the consequences if the contractors were caught doing work without a permit, so it is clear that any remedy associated with such an infraction does little to assist workers like Johnson who are injured because of such decisions.

There is no change in judgment.

Petitioners' petition for rehearing is denied.


O'ROURKE, Acting P.J.


Copies to: All parties

Filed 6/4/24 (unmodified version)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CBRE et al., | D083130 |
| Petitioners, | |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | (Super. Ct. No. 37-2021-00033025-CU-PO-CTL) |
| Respondent; | |
| JAKE JOHNSON, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING on a petition for writ of mandate after the superior court denied summary judgment. Marcella O. McLaughlin, Judge. Petition granted.

Niddrie Addams Fuller Singh, John S. Addams; Wingert Grebing Brubaker & Juskie, Alan K. Brubaker, Ian R. Friedman and Steven J. Scordakis for Petitioners.

Hoffman & Forde, Michael Dicks; Berding & Weil, Anne L. Rauch and Trinette S. Sachrison for Real Party in Interest.

No appearance for Respondent.

Jake Johnson was injured while working as an electrician on a construction project in a building owned by Property Reserve, Inc. (PRI) and

managed by CBRE (collectively, Petitioners). When injured, Johnson was employed by PCF Electric (PCF), a subcontractor hired by Crew Builders (Crew), the general contractor for the project. Johnson filed a complaint against Petitioners, Crew, and PCF for damages.

Petitioners moved for summary judgment based on the *Privette* doctrine, which generally protects entities that hire independent contractors from liability for injuries sustained by employees of the independent contractor while working on a project. (See *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*).) The trial court denied Petitioners' motion, finding a triable issue of fact as to when they hired Crew for the project. In the instant petition for writ of mandate, Petitioners assert the trial court erred by focusing on the execution date of the written contract, and they ask this court to issue a writ compelling the trial court to grant their motion for summary judgment.

We agree the trial court erred in denying Petitioners' motion for summary judgment. A written contract is not required to invoke the *Privette* doctrine, and the undisputed facts establish that Petitioners delegated control over the tenant improvements to Crew prior to Johnson's injury.

The undisputed facts also establish that no exception to the *Privette* doctrine applies. Prior to Johnson's injury, Petitioners and Crew mutually agreed to proceed with the project without obtaining permits such that the permitting process was never within the scope of the contracted work. Because the evidence conclusively shows PCF was able to discover any non-code-compliant wiring itself, even in the absence of permits, the "concealed hazardous condition" exception to the *Privette* doctrine is inapplicable as a matter of law. Further, because the decision to forego the permitting process did not affect the means by which PCF and its employees performed the

2

electrical work for which they were hired or the manner in which they ensured their own safety, the "retained control" exception to the *Privette* doctrine is equally inapplicable.

Because no triable issues of material fact preclude summary judgment, we grant Petitioners' requested relief.

I.

PRI owns an office building in San Diego managed by CBRE. On April 9, 2019, PRI entered into a lease agreement with a new tenant for a suite in the building. The lease was to commence on June 1 and required PRI to make certain tenant improvements.

During the lease negotiations, Petitioners solicited a bid from Crew to act as the general contractor for the tenant improvement project, and on March 4, Crew submitted its bid. Crew believed a permit was required for the work, as reflected in the bid. The parties began negotiating a formal service contract; however, they had a standing relationship, and it was common for Crew to begin work for Petitioners before finalizing a contract.

On March 18, Crew sent CBRE a timeline for the project that still included the permitting process, noting the project would need to begin the following week to meet the tenant's move-in date. On March 22, CBRE's senior real estate manager asked for an updated timeline "without a permit," indicating, "[w]e'll probably get started on this one right away."

On April 5, PRI requested that CBRE ask Crew to make changes to the bid, including omitting permits because PRI did not think they were needed. Crew's April 5 bid excluded permits but still included other line items to bring the project "up to code." On April 8, Crew submitted a revised and final bid excluding additional permit-related line items at Petitioners' request.

3

PRI's asset manager "gave the ok to begin" on April 9, and work on the project commenced.

In soliciting bids from subcontractors, Crew indicated the project "won't be permitted." Crew subcontracted the electrical work on the project to PCF. PCF began work on the project on April 10 but did not execute a formal written subcontract with Crew until April 15.

PCF's April 15 bid included researching the existing electrical system and putting it in "safeoff," a safe working condition also called "lockout/tagout," prior to commencing work. PCF's site superintendent inspected the site, traced the circuits, and performed lockout/tagout prior to demolition at the outset of the project. Johnson was not involved in this process.

On April 26, Johnson was working as foreman on the electrical wiring in the suite. Johnson knew no permits had been pulled for the project. He also knew the 277-volt power circuit was turned on to power the building's lights, as the mandatory temporary lighting had been removed the prior day. However, he believed the 277-volt system was "separate and apart" from the 120-volt system he was working on, as currently required by code. Further, he did not know there were no engineering plans, as-built drawings, as-built plans, building inspections, or plans to bring the building up to code. Prior to April 26, someone had removed the PCF superintendent's lockout/tagout. While attempting to replace a cover on a junction box labeled as 120-volt and containing wires color-coded as 120-volt under the current code, Johnson touched a live 277-volt wire, fell off a ladder, and sustained serious injuries.

According to the deposition testimony of PCF's site superintendent and person most knowledgeable, "a foreman on a job site like that should not have trusted color codes or voltages," and he personally uses both his meter and

his "hot stick" to test every "[o]utlet, switch, box, anything. Any wire, any electrical." PCF's preconstruction manager said PCF protocol was to hot-stick every box, even after inspection and lockout/tagout. Petitioners' expert similarly opined that best practice is for an electrician to "assume all circuits 'hot' until you've proved they're not." He also opined "[t]here was no possible role for CBRE or PRI in the required lockout/tagout process."

Petitioners and Crew executed their formal service contract on May 13. The contract included a paragraph specifying Crew was to obtain all permits, licenses, and approvals necessary to perform and complete the work, at its sole cost and expense.

Johnson filed a complaint against Petitioners, Crew, and PCF for damages arising out of the April 26 incident. After discovery, Petitioners filed a motion for summary judgment, asserting all Johnson's claims as to them were barred by the *Privette* doctrine. Johnson opposed, asserting: (1) there was no contract delegating responsibility for workplace safety between Petitioners and Crew or PCF at the time of the incident, and (2) material issues of fact remained as to whether an exception to the *Privette* doctrine applied.

The trial court denied Petitioners' motion, concluding there was a triable issue of material fact as to when Petitioners hired Crew for the project such that Petitioners were not entitled to judgment as a matter of law. In so concluding, the trial court relied on the deposition testimony of PRI's asset manager who, when asked about PRI's policy as to tenant improvement contracts, responded, "we didn't do anything oral." He further explained that, "as the landlord, we would . . . wash [our] hands, so to speak, of the deal once we had the lease signed, . . . and then everything would turn over to CBRE." While he knew CBRE would sign agreements with the contractor

5

Petitioners chose, he was not involved and thus did not "know the progression of when those would be signed and things like that."

The trial court, however, simultaneously granted Crew's motion for summary judgment, concluding *Privette* barred Johnson's claims against it because there was no evidence (1) Crew retained control over any aspect of PCF's performance of the contracted work or (2) the mislabeled junction box was a "concealed hazard" not reasonably discoverable by PCF. It also granted PCF's motion for summary judgment, finding workers' compensation to be the sole remedy for Johnson's injury. Johnson obtained recovery through workers' compensation.

## II.

"'Where the trial court's denial of a motion for summary judgment will result in trial on nonactionable claims, a writ of mandate will issue.'" (*CRST, Inc. v. Superior Court* (2017) 11 Cal.App.5th 1255, 1259-1260.) Petitioners contend the trial court erred in denying their motion and seek a writ of mandate compelling the trial court to vacate its previous order and enter a new one granting summary judgment under *Privette*.

## A.

In *Privette*, the California Supreme Court recognized the common law principle that "a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work." (*Privette, supra,* 5 Cal.4th at p. 693.) The doctrine presumes that the hirer of an independent contractor "ordinarily delegates to that independent contractor all responsibility for the safety of the contractor's workers." (*Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 264 (*Sandoval*).) This presumption "is grounded in two major principles: first, that independent contractors by definition ordinarily control the manner of

6

their own work; and second, that hirers typically hire independent contractors precisely for their greater ability to perform the contracted work safely and successfully." (*Id.* at p. 269.) Thus, we generally presume "that a hirer delegates all control over the contracted work, and with it all concomitant tort duties, by entrusting work to a contractor." (*Id.* at p. 270.)

However, "that presumption gives way to two recognized exceptions: where the hirer . . . withholds critical information regarding a concealed hazard . . . or retains control over the contractor's work and actually exercises that control in a way that affirmatively contributes to the worker's injury." (*Sandoval, supra,* 12 Cal.5th at p. 264.)

B.

A trial court shall grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

As the moving party, Petitioners had the initial burden of establishing that Johnson as plaintiff either could not prove or that there was a complete defense to each cause of action as alleged in the complaint. (§ 437c(p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 853 (*Aguilar*).) Assuming Petitioners met that burden by asserting that the *Privette* doctrine immunized them against all stated causes of action, the burden then shifted to Johnson to present evidence demonstrating a triable issue of material fact: in other words, evidence that would allow a reasonable trier of fact to make a factual finding in favor of Johnson by concluding one of the *Privette* doctrine's exceptions applies. (§ 437c(p)(2); *Aguilar, supra,* 25 Cal.4th at pp. 843, 850.)

We review the trial court's order denying Petitioners' motion for summary judgment under the same legal standard as the trial court and

7

independently assess the correctness of the ruling. (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 231.) "[W]e examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) Nonetheless, a party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.)

C.

Petitioners assert they met their initial burden by presenting evidence sufficient to establish that, prior to the date of Johnson's injury, they hired Crew as an independent contractor, who in turn hired PCF, thus activating the *Privette* presumption of complete delegation. They contend the trial court improperly focused on the date of execution of the written services contract with Crew and, contrary to the trial court's apparent reasoning, the *Privette* doctrine applies even without a written contract.

In response, Johnson claims the trial court correctly identified a material factual dispute regarding the *scope* of the agreement: specifically, what safety protocols Petitioners delegated to Crew and when. He contends there are triable issues of fact as to whether Petitioners fall under one of the *Privette* doctrine's exceptions, either because they (1) failed to disclose a dangerous, concealed condition in the non-compliant electrical wiring or (2) retained control by instructing Crew to proceed without a permit.

1.

We begin with Petitioners' claim that the trial court incorrectly focused on the execution date of Petitioners' written contract with Crew as a disputed issue determinative of the *Privette* doctrine's applicability.

8

First, to the extent the trial court suggested a written contract was necessary for *Privette* to attach, our high court recently rejected that premise in *Sandoval*. It explained the doctrine is not based in a contract's terms but rather in the delegation implicit when a hirer turns over control of the worksite to the contractor to undertake the work, whether by written or informal agreement. (*Sandoval*, *supra*, 12 Cal.5th at pp. 271, 274.) Thus, the nonexistence of a written contract at the time of Johnson's injury is immaterial.

Second, to the extent the trial court found, and Johnson maintains, that a triable issue of fact exists as to whether Petitioners delegated control over the tenant improvement project to Crew prior to the effective date of the agreement at all, we disagree.

Although below Johnson asserted as an undisputed fact that "PRI hired Crew Builders as the general contractor," he now claims otherwise, insinuating several items of evidence raise an inference that the parties "fraudulently re-characterized their arrangement as one of general contractor" after Johnson's injury to "allow[ ] them to argue the presumptions of implied delegation under *Privette*." We, however, agree with Petitioners that the evidence on which Johnson relies does not reasonably give rise to the speculative inference he advances.

Here, as Petitioners assert, undisputed evidence establishes that Petitioners had previously hired Crew, a licensed general contractor, for numerous tenant improvement projects on the property. Petitioners and Crew thus had developed an "understanding" that Crew would begin work on projects before a formal contract was finalized. Petitioners asked Crew to immediately start this project in accordance with that understanding. Crew defined the full scope of the project's work in its detailed bid and formulated

9

the construction schedule for the project, subject to input from Petitioners. There is no dispute Crew subcontracted all the electrical work for the project to PCF, which began work as a subcontractor on April 10, and no dispute that Johnson was working on the project as an employee of PCF on the day of the incident several weeks later. On this evidence, Petitioners hired Crew and implicitly delegated complete control of the worksite, including its safety, to Crew before the date of Johnson's injury.

Johnson's attempts to rebut that presumption and raise triable issues fail. He points to (1) the testimony from PRI's asset manager and person most knowledgeable stating he personally did not have, and he did not "know of anyone" else who had, an oral contract with Crew prior to entering into the formal services contract; and (2) the May 3 effective date of the written contract between Crew and Petitioners, to support an inference that, under its management agreement with PRI, CBRE retained control over the tenant improvement project until the written agreement took effect. We, however, agree with Petitioners that the asset manager's testimony is irrelevant. Whether PRI's asset manager "knew" of any informal agreement between Petitioners and Crew, and whether such agreements were against PRI policy, does not preclude such agreements from existing, particularly given the asset manager also stated he would "wash [his] hands" once the lease was signed such that "everything would turn over to CBRE" to contract with the contractor. Given the asset manager's clear lack of personal knowledge on the issue of the Crew contract, his statements are of no evidentiary value. We further agree with Petitioners that despite the May 3 effective date of Crew's contract with Petitioners, the contract clearly specifies that any work performed prior to the execution date "shall be governed by the terms and conditions of this Contract." This supports, rather than undermines, Crew's

10

assumption of a general contractor role from the get-go. Crew's final bid, which was incorporated as the scope of work in the final written agreement, and Crew's timeline for the project evidence that Crew was acting as general contractor at the time of Johnson's injury.

Johnson further relies on the fact that Crew's April 15 contract with PCF states "NONE" as the date Crew entered into a prime contract with Petitioners to claim Crew "disavowed" that role. Yet we are not persuaded by this speculative inference. Instead, the reasonable inference the evidence supports is that "NONE" was intended to convey the undisputed fact that the relevant contract was not yet finalized. Johnson additionally points to a provision in CBRE's February 2018 Health, Safety and Environmental Minimum Performance Requirements for Contractors (Manual) providing that "[t]here may be periods of time when CBRE is designated by their client to serve as the Prime Contractor," in which circumstance CBRE will "have the sole responsibility for oversight of all construction means, methods," and safety procedures, to show that CBRE was acting as the general contractor at the time of the incident. But the fact that PRI *can* designate CBRE to serve as a general contractor is not evidence CBRE was acting in that capacity here. Johnson points to no evidence showing PRI so designated CBRE for this project. Even if PRI had designated CBRE as the prime contractor, that does not prevent CBRE from delegating any control it had over the project to Crew as the general contractor. The same is true of the provision in PRI's contract with CBRE vesting CBRE with the responsibility to keep the premises "in full compliance with all laws, orders, requirements, and regulations" and supervise construction projects, as well as the provisions in the Manual providing that contractors must receive authorization from CBRE before shutting down electrical systems, locking/tagging out systems,

11

reenergizing any systems, or initiating emergency lock removal procedures. Johnson cites no authority holding any of these duties nondelegable nor evidence that these duties were not delegated in this instance.

Ultimately, the evidence Johnson cites does not support his claim that CBRE, rather than Crew, was the project's general contractor prior to execution of the formal agreement and thus does not support Johnson's speculation that the contract fraudulently "recharacterized" the role for which Crew was hired.  Accordingly, we conclude the evidence establishes that Petitioners hired Crew as the general contractor for this project, as that term is used in the context of the *Privette* doctrine, and they turned the premises over to Crew to begin its work prior to Johnson's injury, thereby activating the doctrine's presumption of delegation.  (*Alvarez v. Seaside Transportation Services LLC* (2017) 13 Cal.App.5th 635, 643-644.)

2.

The conclusion that Petitioners hired Crew in a manner sufficient to invoke the *Privette* presumption of delegation does not end the relevant inquiry, however, given the presumption is subject to two exceptions. (*Sandoval, supra,* 12 Cal.5th at p. 264.)

a.

We begin with Johnson's claim that triable issues of fact exist as to whether the *Privette* exception for failure to disclose a concealed hazard applies.  In *Kinsman v. Unocal Corp.*, our Supreme Court held a landowner can be liable for an injury to a contractor's employee where (1) "the landowner knew, or should have known, of a latent or concealed preexisting hazardous condition on its property;" (2) "the contractor did not know and could not have reasonably discovered this hazardous condition;" and (3) "the landowner failed to warn the contractor about this condition."  (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 664 (*Kinsman*).)

12

As the *Kinsman* test is conjunctive, we focus on Johnson's claim that triable issues of fact exist as to whether PCF or Johnson could reasonably have discovered "the hazardous condition." Whether the alleged hazard was the lack of permits or the mislabeled and miswired junction box is somewhat unclear from Johnson's brief. Either way, however, the evidence on which Johnson relies is misdirected in that it focuses on what permit inspections and as-built drawings could have revealed rather than what PCF and Johnson were independently capable of discovering.

To the extent the lack of permits or permit-related plans and drawings is alleged to be a "hazardous condition," because it potentially allowed conditions not compliant with current code requirements to remain on site, Petitioners argue that condition was reasonably discoverable by PCF "inquiring whether a permit, as-built drawings, and engineering plans were obtained." We agree. Johnson cites no evidence showing this simple measure was impracticable or impossible.

To the extent the non-code-compliant junction box itself is the hazardous condition, Johnson acknowledges the trial court granted Crew's motion for summary judgment based on its finding that there was "no evidence . . . suggesting PCF – an electrical subcontractor – could not have reasonably discovered the hazardous condition." Petitioners likewise claim the energized wire was readily discoverable by metering it. Again, we agree.

The undisputed testimony of PCF's site superintendent established that Johnson's meter would have revealed the 277-volt wire in the junction box had he used it. According to Petitioners' expert, Johnson's hot stick, which he had nearby at the time of the accident, also would have revealed the wire was energized and unsafe. PCF's preconstruction manager said it was best practice to hot-stick each electrical item, even after initial inspection of

13

the worksite and lockout/tagout. Petitioners' expert echoed the sentiment by opining electricians should assume a wire is hot until proven not. This evidence establishes there were reasonable—indeed, easy—ways for Johnson or any other PCF employee to discover the dangerously live 277-volt wire in the 120-volt junction box. Johnson points to no evidence to the contrary. Thus, the *Kinsman* exception is inapplicable as a matter of law.

b.

Johnson primarily contends the retained control exception to the *Privette* doctrine announced in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*) applies. In *Hooker*, our Supreme Court rejected the notion a hirer could be liable "merely because [it] retained the ability to exercise control over safety at the worksite," instead concluding "imposition of tort liability on a hirer should depend on whether the hirer *exercised* the control that was retained in a manner that *affirmatively* contributed to the injury of the contractor's employee." (*Id.* at p. 210.)

Johnson argues a triable issue of material fact remains as to (1) the scope of Petitioners' delegation of control to Crew at the time of the accident and (2) whether Petitioners affirmatively contributed to Johnson's injury. He claims that, "[n]ot only did [Petitioners] decline to delegate the most fundamental construction workplace safeguard required by law [i.e., the permitting process], but they also strategically instructed all involved in the [tenant improvements] to skip that process to meet their goals of speeding through the [project]." Petitioners respond that their decision to proceed with the project without obtaining permits was not a retention of control over safety procedures for the project; accordingly, their delegation to Crew was complete and *Privette* bars liability.

14

Construing all evidence and reasonable inferences in favor of Johnson, we conclude the retained control exception does not apply here.

i.

In the decades since *Hooker* was decided, the high court has clarified and further refined the retained control exception.

In *Sandoval*, the court explained that "[a] hirer 'retains control' where it retains a sufficient degree of authority over the manner of performance of . . . the work the contractor has agreed to perform"—i.e., the "'contracted work.'" (*Sandoval, supra,* 12 Cal.5th at p. 274.) "[A] hirer's authority over the contracted work amounts to retained control only if the hirer's exercise of that authority would sufficiently limit the contractor's freedom to perform the contracted work in the contractor's own manner." (*Id.* at p. 275.) A corollary is that "[a] hirer's authority over *noncontract* work . . . does not give rise to a retained control duty unless it has the effect of creating authority over the contracted work." (*Id.* pp. 274-275, italics added.)

Even where a hirer retains control over contracted work, the hirer only "'actually exercise[s]'" that control if it "in fact involve[s] itself, such as through direction, participation, or induced reliance," in the contract work and "exert[s] some influence over the manner in which the contracted work is performed." (*Sandoval, supra,* 12 Cal.5th at p. 276.) No affirmative act is required; a failure to act can suffice. (*Id.* at p. 277.) Our Supreme Court, citing prior decisions, recently provided a nonexhaustive list of situations in which courts have concluded retained control was actually exercised, including "directing the manner or methods in which the contractor performs the work; interfering with the contractor's decisions regarding the appropriate safety measures to adopt; requesting the contractor to use the hirer's own defective equipment in performing the work; contractually prohibiting the contractor from implementing a necessary safety precaution;

15

or reneging on a promise to remedy a known hazard." (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 47 (*Gonzalez*).)

For a hirer's actual exercise of retained control to affirmatively contribute to the injury, it must contribute "in a way that isn't merely derivative of the contractor's contribution to the injury." (*Sandoval*, *supra*, 12 Cal.5th at p. 277.) The contribution need not be substantial. (*Id.* at p. 278.) If "the contractor's conduct is the immediate cause of injury," the high court explained that inducing "the contractor's injury-causing conduct"—as the hirer in *McKown v. Wal-Mart Stores, Inc.* did when it requested a contractor use defective equipment in completing the contracted work—affirmatively contributes to the injury. (*Id.* at p. 277, citing *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 225 (*McKown*).) Yet if the hirer's exercise of control merely provides an opportunity for the hirer to prevent the injury-causing conduct, as in *Hooker*, an affirmative contribution to the injury is lacking. (*Ibid.*, citing *Hooker, supra*, 27 Cal.4th at p. 214.)

The hirer's exercise of retained control also affirmatively contributes to the injury if it independently contributes to the injury. (*Sandoval*, *supra*, 12 Cal.5th at p. 277.) Such would be the case if the hirer "'promises to undertake a particularly safety measure, then . . . negligent[ly] fail[s] to do so,'" or prohibits the contractor from taking safety measures "that might have prevented injury." (*Ibid.*, citing *Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3; *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120, 1133-1134 (*Ray*).)

ii.

Bearing these principles in mind, we conclude the retained control exception is inapplicable as a matter of law because Petitioners only retained control over noncontract work that did not create "authority over the contracted work." (*Sandoval*, *supra*, 12 Cal.5th at pp. 274-275.)

16

The undisputed evidence establishes that, while Crew included permits in its initial bids, when Petitioners requested Crew omit permits, Crew willingly complied. The evidence is clear the Crew employee responsible for submitting the bid knew permits were required. Crew was free to walk away from the project at that point in time, or insist that permits remain a part of the project. Yet the evidence does not show it did so. Instead, even as negotiations as to the scope of the project were ongoing, Crew communicated that the project was not permitted in soliciting bids from subcontractors. Crew's April 8 bid, which resulted in Petitioners giving the green light to begin work on the project, did not include permits. This evidence conclusively shows that at the time of Johnson's accident, permits were not part of the contracted work. Petitioners did not retain control over whether, when, and how to pull permits as part of the project; everyone simply agreed from the beginning permits were not part of the project at all.

To the extent Johnson disputes PRI's knowledge of whether permits were required, as Petitioners note, he fails to explain how PRI's alleged motive to save money and time and get a paying tenant into the space more quickly is at all relevant to the retained control exception. Although Johnson claimed during oral argument that the time constraints prevented contractors from taking safety measures, he points to no safety measures beyond the permit process itself prevented by that short timeframe. Similarly, whether and the degree to which the formal contract between Petitioners and Crew delegated control over the permitting process is immaterial to the understanding the parties had and were operating under prior to and at the time of Johnson's accident. Finally, to the extent Johnson questions the extent to which Crew delegated its control over safety

17

procedures to PCF, we need only resolve whether *Petitioners* retained any such control, and we conclude they did not.

The authorities and evidence on which Johnson relies to claim otherwise do not persuade us. Analogizing to *Brown v. Beach House Design & Development* (2022) 85 Cal.App.5th 516 (*Brown*), Johnson primarily contends alleged contractual irregularities, addressed and rejected above, make the scope of the delegation of workplace safety to Crew, if any, a triable issue. Yet we note *Brown* is also unhelpful to Johnson on the issue of safety delegation as it pertains to permits. In *Brown*, the Court of Appeal determined triable issues of fact prevented summary judgment in favor of a general contractor when a subcontractor's employee fell from scaffolding erected by a different subcontractor, given uncertainties arising from the language in the contract with the scaffolding subcontractor as to whether the contract was even still in effect and whether safety over the scaffolding as to other contractors' employees was ever delegated to it by the general contractor in the first place. (*Id.* at pp. 521, 523, 531-532.) As Petitioners argue, this case is factually distinguishable given it does not concern injuries arising from the provision of defective equipment. The safety of scaffolding erected during and as of part of the project is clearly part of the contracted work and a matter over which someone, whether the general contractor or the subcontractor, exercised control. Such is not the case as to permits entirely omitted from the scope of work at the time of the injury.

Nonetheless, invoking *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582 (*Regalado*), Johnson claims Petitioners "exercised control over the safety of the work site because of the lack of proper permitting." Johnson's characterization of *Regalado*, however, is oversimplistic. In *Regalado*, the evidence established that the owner/builder of a pool installation "was

18

responsible for obtaining permits and calling for inspections" and, having failed to do so, told the contractor he hired for the project that he did. (*Id.* at pp. 588-589, 597.) One of the contractor's employees was injured due to the contractor's installation of an unventilated propane heater in the vault housing the pool equipment, which expert testimony established would not have been allowed had permits been sought. (*Ibid.*) As Petitioners note, however, they did not promise to obtain permits and renege; instead, permits were excluded by agreement from the scope of the contracted work such that no one assumed control over that process. Further, unlike in *Regalado*, where the very installation of the heater in the vault, work the contractor was hired to do, would not have been approved and would not have happened in that way had permits been sought, Johnson cites no evidence showing that requiring him to perform the contracted electric work in an environment that could contain non-code-compliant electrical systems influenced or restricted the manner in which he could perform his contracted electrical work.

Johnson also relies on *Tverberg v. Fillner Const., Inc.* (2012) 202 Cal.App.4th 1439 (*Tverberg*). There, a general contractor subcontracted out to different contractors (1) the construction of a canopy and (2) the installation of large posts that required the digging of holes near the site for the canopy. (*Tverberg, supra*, 202 Cal.App.4th at pp. 1442-1443.) The canopy subcontractor asked the general contractor to cover the holes but was told it lacked the equipment "to do so that day." (*Id.* at p. 1443.) The request was ignored again the following day, and the canopy subcontractor fell into a hole and was injured. (*Ibid.*) The Court of Appeal concluded the general contractor may have negligently exercised its retained control by ordering the creation of the holes and requiring the canopy subcontractor to work near them. (*Id.* at p. 1448.) Further, the evidence supported an inference that the

19

general contractor had undertaken to cover the holes when the needed equipment was available yet failed to do so. (*Ibid*.) While Johnson claims Petitioners' direction to Crew to not get permits is comparable, here, Petitioners did not tell PCF they would obtain permits and then not. Nor did they interfere with the performance of PCF's contracted electrical work or the manner in which it was to be completed. Further, unlike the general contractor in *Tverberg*, who directed the creation of a hazardous condition in the vicinity of the canopy subcontractor's work, Johnson does not identify evidence that Petitioners created the miswired and mislabeled junction box. At most, they allowed a preexisting and potentially dangerous condition to persist, which is insufficient for liability to attach under the retained control exception. (*Hooker*, *supra*, 27 Cal.4th at pp. 215-216.)

Johnson additionally claims Petitioners' decision to forego the permitting process is similar to what happened in *Ray*, where the hirer, a transportation agency, and its general contractor contractually prohibited a subcontractor hired to construct connector bridges from erecting barricades to close roadways without advance written permission. (*Ray*, *supra*, 98 Cal.App.4th at pp. 1132-1133.) Because (1) the general contractor retained exclusive control to close roads and (2) both the transportation agency and the general contractor had a duty to the driving public, triable issues of fact prevented summary judgment where the subcontractor's employee was killed by construction materials blown onto the road during unexpected high winds. (*Id*. at pp. 1134-1136, 1139.) We agree with Petitioners that they did not prevent PCF and Johnson from undertaking measures to ensure safety, much less, as in *Ray*, "'the one safety measure that might have saved the plaintiff's life.'" (*Kinsman*, *supra*, 37 Cal.4th at p. 671.) Rather, we agree with Petitioners that the undisputed evidence

20

shows there were safety measures available here to prevent Johnson's electrocution and fall, as explained above.

Finally, in *Browne v. Turner Construction Co.* (2005) 127 Cal.App.4th 1334 (*Browne*), a company hired a general contractor that in turn hired a subcontractor to install a fire sprinkler system. (*Browne*, *supra*, 127 Cal.App.4th at p. 1337.) The subcontractor's employee fell off a ladder and was injured. (*Ibid.*) He claimed he had to use a ladder because the hirer and contractor had removed hydraulic lifts previously available in the work area. (*Id.* at p. 1338.) He also claimed the hirer and contractor had installed a fall protection system they required workers to use but had removed the system several months prior. (*Id.* at pp. 1338-1339.) The evidence thus suggested the hirer and contractor "actually *created* the situation in which" the employee's injuries "were likely to occur." (*Id.* at pp. 1345-1346.) The Court of Appeal therefore concluded the retained control exception could apply, as it was "undisputed that [the hirer and general contractor] undertook to arrange and supply the means and methods of work, including safety systems and devices, which they then withdrew before the work was completed, leaving plaintiff with no safe means of completing the work." (*Id.* at pp. 1345.) While Johnson claims Petitioners similarly actively contributed to his injuries by directing Crew not to undergo the permitting process, we agree with Petitioners that *Browne* is distinguishable given Petitioners never affirmatively undertook a duty to supply equipment for the method of work and withdraw it. Instead, Petitioners never undertook the permitting process at all.

During oral argument, Johnson also claimed similarities to *McKown*, in which a retailer that hired a contractor requested that the contractor use the retailer's own forklifts if possible to perform the work for which it was hired.

21

(*McKown*, *supra*, 27 Cal.4th at p. 225.)  The forklifts lacked a safety feature, leading the Supreme Court to conclude the retailer affirmatively contributed to the injury by inducing the contractor to carry out its contracted work in a particular manner.  (*Ibid.*)  But that is not the case here.  Omitting the permitting process from the scope of the contracted work for the project did not affect the manner in which PCF carried out the electrical work for which it was hired.

Instead, this case is analogous to *Sandoval*, a case on which Petitioners rely.  There, a company hired a contractor "to inspect and verify the amperage capacity" of its switchgear equipment.  (*Sandoval*, *supra*, 12 Cal.5th at pp. 265-266.)  That contractor in turn hired Sandoval to assist in an inspection of "the main cogen circuit."  (*Id.* at p. 266.)  The company's employees fully powered down the power to the main cogen and reminded the contractor's team that some circuits remained live.  (*Id.* at pp. 266-267.)  Sandoval was electrocuted by an arc flash from a live circuit the contractor exposed.  (*Id.* at p. 267.)

The Supreme Court concluded the company owed Sandoval no retained control duty arising from its control over the power-down process, because that process "was not within the scope of work" the company "had entrusted to" the contractor.  (*Sandoval*, *supra*, 12 Cal.5th at p. 279.)  The power-down process was instead noncontract work that could only give rise to a retained control duty if it resulted in retained control over the contracted work of inspecting the main cogen.  (*Id.* at p. 280.)  Even though the company's performance of the power-down process limited the contractor's freedom to power down other circuits, that "imposed too little a degree of control over" how the contractor performed its inspection.  (*Ibid.*)  Even if the company effectively required the contractor "to perform its work in . . . the presence of

22

live circuits," the contractor "was aware of and had ample freedom within the scope of its entrusted work to accommodate the presence of the live circuits effectively in its own manner." (*Ibid.*) Accordingly, the company did not owe Sandoval any duty to prevent his injury. (*Id.* at p. 281.)

The same is true here. Obtaining permits was never within the scope of the work delegated to Crew. Arguably, obtaining permits also was not noncontract *work*, given the clarity of the evidence that neither Petitioners nor anyone else ever intended to pull any. But even as noncontract work, the failure to pull permits here "imposed too little a degree of control over" how Crew completed the tenant improvement process, or how PCF completed the electrical work, entrusted to each of them. (*Sandoval*, *supra*, 12 Cal.5th at p. 280.) The evidence here establishes that Crew "approach[ed]" the work "the exact same way as [it] would with a permit." The evidence also shows PCF and its employees had "ample freedom" to complete the work entrusted to them, even while accommodating any possibly non-code-compliant electrical components by, for example, investigating the site, completing the lockout/tagout protocol and keeping it in place throughout the work, and hot-sticking and metering the wiring. While Johnson notes that PRI controlled access to the building's electrical rooms, he does not explain how that fact affects these available safety measures.

Petitioners also invoke *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590 (*SeaBright*) and *Delgadillo v. Television Center, Inc.* (2018) 20 Cal.App.5th 1078 (*Delgadillo*), both of which held that, "even where an unsafe condition exists on the premises due to the landowner's failure to comply with specific statutory and regulatory duties, the landowner is not liable because it is the contractor who is responsible for its own workers' safety." (*Gonzalez*, *supra*, 12 Cal.5th at p. 48.) In *Gonzalez*, our Supreme

23

Court concluded this general principle applies "even where the contractor is unable to minimize or avoid the danger through the adoption of reasonable safety precautions." (*Id.* at pp. 45, 48, 53-54.) Although "there will sometimes be financial and other real world factors that might make it difficult for an independent contractor to raise safety concerns with the hirer or to simply walk away from a job it has deemed to be unsafe," the contractor "can typically factor the cost of added safety precautions or any increased safety risks into the contract price" and "purchase workers' compensation to cover any injuries sustained while on the job." (*Id.* at p. 51.)

While Johnson claims this case is distinguishable from *SeaBright* and *Delgadillo* in that Petitioners "expressly directed their contractors . . . to skip the required steps to meet the regulatory requirements," as already discussed, this argument depends on a view of the permitting process as part of the contracted work. Yet the evidence is clear that it was not.

Johnson urges us to consider the policy implications of allowing *Privette* to shield a hirer from liability despite entering into an upfront agreement to "flout[ ]" the law. We, however, agree with Petitioners that those who enter into such agreements are held accountable in appropriate ways such that our decision will not encourage such agreements to proliferate. As Johnson's return acknowledges, a person who violates the permit requirements in the Land Development Code is strictly liable for a misdemeanor under the San Diego Municipal Code, and can be subjected to fines, custody, injunctive relief, civil penalties, abatement, and other reasonable mitigation measures. (See San Diego Mun. Code, §§ 121.0311-121.0312.) As Petitioners noted during oral argument, this liability applies not only to them, but also to contractors like Crew and PCF, who have an independent obligation to comply with the Land Development Code, including its permitting

24

requirements. (See *id.* §§ 121.0302(b)-(c).) The record evidence is also undisputed that, should the city determine Petitioners were engaging in unpermitted work, the city could stop the work and require Petitioners to take on the time and expense of going through the permitting process, anyway.

In short, the evidence establishes that (1) obtaining permits for the project was never part of the work entrusted to Crew or PCF and (2) the removal of the permitting process from the scope of work did not impact the manner in which contractors performed their contracted work or provided for their own safety. Accordingly, no triable issue of fact giving rise to the retained control exception remains. The *Privette* doctrine applies as a matter of law, and Petitioners presumptively delegated any "injury-prevention tort duty" they owed Johnson. (See *Sandoval*, *supra*, 12 Cal.5th at p. 281.) Under these circumstances, a jury trial to determine whether and the extent to which permits may have prevented Johnson's injuries is unwarranted. (*Id.* at pp. 282-283.)

III.

Let a writ of mandate issue directing the respondent superior court to vacate its order denying PRI's and CBRE's motion for summary judgment and enter a new order granting the motion.  Costs are awarded to PRI and CBRE.

CASTILLO, J.

I CONCUR:


O'ROURKE, Acting P. J.

KELETY, J., Dissenting.

A jury should decide whether Property Reserve, Inc. (PRI) and CBRE (collectively, Petitioners) retained control over a construction project when they instructed their general contractor, Crew Builders (Crew), not to obtain legally necessary permits; and, whether that instruction contributed to the injuries sustained by Jake Johnson while working as an electrician for a subcontractor, PCF Electric (PCF), hired by Crew. For this reason, I dissent from the majority opinion.

As the majority correctly states, when reviewing the trial court's ruling on a motion for summary judgment, "we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) To survive the motion and proceed to trial, Johnson need only provide evidence demonstrating a triable issue of material fact. In my view, he did so here. In reaching the opposite conclusion and directing the trial court to enter summary judgment in favor of Petitioners, the majority overlooks important evidence that supports Johnson's position.

From the outset, the majority characterizes the decision to proceed without permits as a *mutual agreement* between Petitioners and Crew. The majority then concludes, based at least in part on this characterization, that "the permitting process was never within the scope of the contracted work." (Maj. opn., *ante*, at p. 2.) However, when viewed in a light most favorable to Johnson, the evidence supports a conclusion that there was no such agreement, and, further, but for CBRE's instruction, the permitting would have been within the scope of the work.

First, as to the existence of some kind of "agreement" between the parties, when asked at oral argument, counsel for Petitioners conceded that "*Petitioners made the decision* not to obtain permits" and instructed Crew not to pursue the permit process. Johnson presented evidence confirming that concession. Crew employee Courtney Ciurej testified that it was typical for CBRE to make the decision whether or not to seek permits, and in this case, they decided not to, to save time and money. Crew had other projects with Petitioners, including projects underway in the same building, and this was the regular course of dealing between CBRE and Crew. CBRE acknowledged that if the contractors were "caught" without the required permits, CBRE and PRI would accept responsibility for any fines or delays resulting from CBRE's instruction to the contractors to forego the permit process, showing that they understood the ramifications of that decision.

Second, it is my view that the obligation to obtain permits would have been included within the scope of the contracted work in the absence of CBRE's instruction to forego them. In their motion for summary judgment, Petitioners and their expert emphasized that they could not be responsible for any injuries resulting from the lack of permits because the underlying contract required Crew and PCF to obtain all necessary permits. It is true that the written contract included the permitting requirement, but the contract was not executed until *after* the contractors had been hired, *after* the work had begun without permits, and *after* Johnson had been electrocuted; and, the contract made no reference to CBRE's instruction to the contractors to forego the permitting process. Under the circumstances, it is hard to see the final contract as anything more than *post hoc* window dressing. Nonetheless, the inclusion of a permitting requirement in the final contract

2

contradicts the majority's conclusion that the legally required permits were somehow outside the scope of the contracted work.

Nor is it apparent that CBRE's instruction to forego the requisite permitting had no impact on the contractor's performance of the work. Johnson alleged that by choosing to disregard the mandatory permitting process, Petitioners saved approximately $30,000, primarily by avoiding inspections and the need for engineering or "as-built" drawings of the existing electrical structure. Had those drawing been done, they would have shown changes to circuitry and could have helped identify any unexpected underlying conditions. Petitioners did not truly dispute these allegations. Rather, they again attempt to place the blame on Crew, stating that they "contractually obligated Crew [] and Crew [] contractually obligated PCF [] to obtain whatever permits were required by law to do the work." At a minimum, there is a disputed issue of fact regarding the impact of Petitioners' direction not to obtain the requisite permits.

Beyond that, I reject the notion that simply deciding and instructing that the project proceed without permits was all that PRI and CBRE needed to do to remove the permitting process from the scope of work, thereby absolving themselves of any related liability. By endorsing that notion, the majority opinion essentially leaves building owners and property managers like PRI and CBRE free to dictate whether obtaining a legally required permit is within the scope of work for any given contract. This cannot be the case. The parties and the majority agree that the contracted work required a permit. It was not a choice that the parties could simply decide to exclude. It was a legally required step in completing the contracted work, the purpose of which is to "ensure projects comply with the minimum standards that help

3

safeguard life or limb, public health, property and welfare."[1]  Petitioners do not dispute this.

For the same reasons, I also disagree with the majority's conclusion that we need not consider the policy implication of allowing *Privette*[2] to shield a hirer from liability in this circumstance simply because the hirer may still be liable for a misdemeanor under the San Diego Municipal Code. (Maj. opn., *ante*, at p. 24.)  As noted above, CBRE had willingly agreed to accept responsibility for consequences if the contractors were "caught" without permits, so it is clear that any remedy associated with such an infraction does little to assist workers like Johnson who are injured because of such decisions.  The policy considerations behind the *Privette* doctrine include fairly spreading the risk created by a contractor's work and encouraging workplace safety.  (*SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 599.)  Allowing hirers to shield themselves from liability by "entering into an upfront agreement to 'flout[]' the law" at the expense of workers serves neither of these purposes.  (Maj. opn., *ante*, at p. 24.)

Petitioners did not simply fail to comply with their own statutory and regulatory duties; they affirmatively directed the contractors to comply with their decision. (Cf. *Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 47−48.)  Counsel for Petitioners conceded this point at oral argument, agreeing that Petitioners "*[took] away something the contractor ordinarily would be delegated to do*," and, in fact, was legally obligated to do.  Thus, in my view, Johnson has presented evidence from which a reasonable trier of fact could

---

[1]     City of San Diego, Developmental Services, Electrical Permit, <sandiego.gov/development-services/permits/electrical-permit> [as of June 4, 2024], archived at <https://perma.cc/ D5PL-UZZU>.)

[2]     *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*).

conclude that Petitioners made a unilateral decision to proceed without permits and, by affirmatively directing Crew and the other contractors to do the same, Petitioners "*exercised* the control that was retained in a manner that *affirmatively* contributed to [Johnson's] injury." (*Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 210; see also *Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 277 [hirer's affirmative exercise of retained control satisfies the affirmative contribution requirement when the hirer prohibits the contractor from taking safety measures that might have prevented the injury].)

The majority suggests that Crew was complicit in Petitioners' decision as they were "free to walk away from the project" or insist that permits be obtained if they did not agree. (Maj. opn., *ante*, at p. 17.) Perhaps they should have. They too had a legal obligation not to work on the project without first obtaining a permit.

Regardless, though, the fact that neither Crew nor PCF refused to proceed without a permit is not relevant in determining whether the retained control exception to *Privette* applies. In virtually every case where courts have applied the retained control exception, the contractors made the choice not to walk away. The contractor in *Tverberg* could have refused to continue work until the nearby holes were covered (*Tverberg v. Fillner Const., Inc.* (2012) 202 Cal.App.4th 1439, 1443); the contractor in *Ray* could have refused to continue work on the bridge without authority to close nearby roadways or, alternatively, could have precluded its workers from leaving the area over which they did have some control (*Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120, 1132–1133); the contractor in *Browne* could have refused to continue work after the hirer removed the hydraulic lifts and fall protection system (*Browne v. Turner Construction Co.* (2005) 127 Cal.App.4th

5

1334, 1337–1339); and the contractor in *McKown* could have refused to allow its workers to use Wal-Mart's forklifts (*McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 225 (*McKown*)).  The contractor's failure to do so was not dispositive in those cases and it should not be dispositive here.

Indeed, in *McKown*, the California Supreme Court expressly acknowledged that the choice was not so simple for a contractor—much like Crew in this case—that had several open contracts with one of the world's largest retailers.  (See *McKown, supra,* 27 Cal.4th at p. 225.)  Refusing to use Wal-Mart's forklifts would have delayed the work and incurred additional costs, such that the contractor "may well have believed that refusal to [do what Wal-Mart asked] would have generated ill will."  (*Id.* at p. 226.)  Likewise, here, there is ample evidence that CBRE and PRI wanted to forego the permitting process to save time and money.  Refusing to comply with CBRE's instruction to skip the permitting process may have cost Crew the project, and jeopardized other projects that it was working on within the same building.  In my view, the entirety of the responsibility for that choice should not fall on Crew, PCF, or Johnson, just as it did not fall on the contractor in these other cases.

Finally, the majority suggests that Johnson could have prevented his own injury by using his hot stick or meter to test the wire that ultimately caused his injuries.  But the standard for determining liability in this context is also not simply who had the last opportunity to avoid the accident.  Rather, absent summary judgment, a jury would be entitled to allocate fault across all relevant parties.  (See *McKown, supra,* 27 Cal.4th at p. 223 ["A jury found that Wal-Mart was negligent in providing unsafe equipment and allocated 55 percent of the responsibility for the accident to [the] employer, 23 percent to Wal-Mart, 15 percent to the manufacturer . . . and 7 percent to McKown"].)

6

Here, as in *McKown*, there is a triable issue of fact regarding the extent to which Petitioners and others contributed to Johnson's injury. Johnson presented evidence that PCF had conducted thorough circuit tracing, that he believed he was working solely on a 120-volt circuit that was powered down at the time of the incident, and that he therefore had no reason to test the wire that ultimately caused his injuries. Construing the evidence in a light most favorable to him, as we must in the context of a motion for summary judgment, it is plausible that a jury could find that the rogue wire would have been identified during the permitting process, had it occurred, but that, in the absence of updated circuit maps or line drawings, it was reasonable for Johnson to believe that the lines he was working on at the time of the injury were solely tied to the 120-volt powered-down circuitry.

Craig Overway, the person most knowledgeable for PCF, testified that PCF had tested every circuit in the suite to determine whether it was 120-volt or 277-volt. On the day of the incident, Johnson was asked to work on 120-volt lines as they related to drop down furniture outlets and a TV outlet. He knew the 277-volt system was powered on because of the need for overhead lighting, but understood that the powered-down 120-volt system he was working on was separate and apart from the powered-on 277-volt system. Petitioners' expert, Loud, confirmed that outlets near the area where Johnson was working were powered by the 120-volt circuit in the junction box at issue. Danny Machado from Crew explained that it was okay to have the lights on—and okay to re-energize the 277-volt circuit—"[i]f you're working on a box that has nothing to do with lighting." That is precisely what Johnson believed he was doing.

Unfortunately, though, there was a live 277-volt wire in the junction box at issue. Overway testified it was "definitely not right" to have 277- and

7

120-volt wires in the same junction box; there should have at least been a divider at a minimum; and the presence of the 277-volt wire was a dangerous condition. Ryan Netherton, the person most knowledgeable for Crew, testified that it was at least possible that the wire was part of a rogue circuit that had originated from somewhere else, perhaps another suite. Overway and Machado explained that typically, one would create as-built drawings for a project, and that those drawings would show any changes to the circuitry, or other underlying conditions that did not match the original building plan. But Overway had never seen any as-built drawings for any of the work he had done in the building. Such drawings would have been created as part of the permitting process.

San Diego Municipal Code section 129.0307, subdivision (e) specifies that, to obtain a permit, the request must include plans that "show a single line diagram of service, feeders, conduit, and wire sizes." Thus, it is reasonable to conclude that by directing that the project proceed without permits, Petitioners removed the need, and the associated expense and time, of creating the requisite "as-built" line drawings. If they had instead allowed Crew to undertake the steps necessary to obtain a permit, the 277-volt line that injured Johnson may well have been identified during that process. Even short of identifying that specific wire, if PCF had at least been aware that there was an overlapping 277-volt circuit (perhaps originating from a neighboring unit) in the area where Johnson was working, they may have required additional precautions. These are questions for a jury to consider.

8

For these reasons, I believe that Johnson has raised triable issues of fact as to whether Petitioners retained control over the contracted work by directing Crew to forego the permitting process; and, as to whether that direction affirmatively contributed to Johnson's injury. I would deny the petition.

KELETY, J.

9